Entered: August 9th, 2024
Signed: August 9th, 2024



**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| The West Nottingham Academy | * | |
| in Cecil County, | * | Case No. 23-13830-MMH |
| | * | |
| Debtor. | * | Chapter 11 (Subchapter V) |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### <u>MEMORANDUM OPINION</u>

A debtor seeking to reorganize under subchapter V of chapter 11 of the Bankruptcy Code[1] often has immediate liquidity needs. The Code provides several effective tools to address those needs while preserving the value of creditors' interests in estate assets. A debtor's ability to use cash collateral under section 363 of the Code is one such tool. A debtor may use cash collateral either with the consent of the affected creditors or upon providing adequate protection of the creditors' interests in the collateral. The question raised by the pending matter turns on two separate but related issues: the extent of a debtor's interest in a prepetition reserve account and the debtor's ability to seek a refund of monies paid as adequate protection pending a valuation of the underlying collateral. In addition, the Court must consider the scope of its postconfirmation jurisdiction, the rights of the estate in the reserve account, and the binding effect of the Court's confirmation order.

---

[1] 11 U.S.C. §§ 101 et seq. (the "Code"). The Court sets forth certain references and citations in the footnotes of this Opinion solely to allow for the provision of more (rather than less) information; the use of footnotes is not intended to minimize the importance of the materials or their relevance to the Court's holding.

As explained in further detail below, the creditor's claims in this matter are significantly oversecured, with a sizable equity cushion in the collateral. That collateral value, in turn, supports the Debtor's requested refund of the adequate protection payments made to the creditor during the pendency of this case. The creditor argues, however, that even if a refund is warranted, those funds remain subject to prepetition use restrictions in the parties' loan documents. The Court considers all the parties' arguments below and concludes that the funds used to make the adequate protection payments were property of the estate under the Code and available for the Debtor's general use in the case. The Debtor should now be able to use those funds to implement its confirmed plan.

## I.    Relevant Background

The West Nottingham Academy in Cecil County, the above-captioned reorganized debtor (the "Debtor"), filed a Motion for Refund of Excess Adequate Protection Payments (the "Motion"). ECF 154. By the Motion, the Debtor asserts that certain funds paid to First National Bank ("FNB") as adequate protection during the pendency of this subchapter V case should be refunded to the Debtor. FNB filed an objection to the Motion. ECF 160. The Court held a hearing on the Motion and all related papers on May 29, 2024 (the "Hearing"). In addition, at the Court's invitation, the Debtor and FNB each filed post-hearing briefs in further support of their respective positions. ECF 172, 173.

The primary issue presented by the Motion is whether the Court can and should direct FNB to return the sum of $146,585.17 (the "Adequate Protection Payments") to the Debtor.[2] The Debtor made the Adequate Protection Payments to FNB under a series of orders of this Court addressing

---

[2] The Debtor operates a private boarding and day school in Cecil County, Maryland. The Debtor began to experience financial difficulties prior to 2019, which were exacerbated by the Covid-19 global pandemic. The Debtor's short-term financing arrangements did not resolve those issues and, on May 31, 2023, the Debtor filed this bankruptcy case under subchapter V of chapter 11 of the Bankruptcy Code. ECF 1.

the Debtor's postpetition use of cash collateral (collectively, the "Cash Collateral Orders").
ECF 30, 51, 57, 77, 85, 105.

At the time of the entry of the Cash Collateral Orders, the parties were in the process of
ascertaining the value of FNB's collateral. The value of a secured creditor's collateral as of the
bankruptcy petition date is a key factor in any adequate protection analysis under sections 361 and
363 of the Code. Given the Debtor's immediate need in the case to use cash collateral, and not
wanting to prejudice any party's rights pending a valuation of the collateral, the Court, by the Cash
Collateral Orders, authorized the Debtor to use cash collateral under section 363, provided that
those funds were used to make monthly adequate protection payments to FNB.[3]

The parties ultimately reached a resolution on the valuation of FNB's collateral, which the
Court approved by orders entered on October 10, 2023. ECF 112, 113. The resulting value of
$10,300,00.00, supported the Court's determination that the claims of both FNB and the United
States of America, acting through the United States Department of Agriculture (the "USDA"), were
fully secured. *Id*.

Shortly after the foregoing resolution, the Debtor filed its proposed plan of reorganization
and its first amended version of that plan (the "Plan"). ECF 121, 124. All of the major parties in
the case supported the Plan, and the Court confirmed the Plan on a consensual basis under
section 1191(a) of the Code on January 30, 2024 (the "Confirmation Order"). ECF 134, 142. The
Effective Date of the Plan occurred on March 1, 2024. ECF 150.

## II.    Jurisdiction and Legal Standards

The Debtor, as a reorganized entity, filed the Motion and invoked the Court's
postconfirmation jurisdiction. The Court's general jurisdiction is established by 28 U.S.C. § 1334,
28 U.S.C. § 157(a), and Local Rule 402 of the United States District Court for the District of

---

[3] The general background on these issues is set forth in the Motion. ECF 154, ¶¶ 17–25.

Maryland.[4] In addition, in the postconfirmation context, the Court must analyze the terms of the Plan and whether the matter brought before the Court bears a close nexus to the bankruptcy case. As one circuit court has explained,

> The question is how close a connection warrants post-confirmation bankruptcy jurisdiction. Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus. Under those circumstances, bankruptcy court jurisdiction would not raise the specter of "unending jurisdiction" over continuing trusts.

*In re Resorts Int'l, Inc.*, 372 F.3d 154, 167 (3d Cir. 2004); *Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 837 (4th Cir. 2007) ("We find the Third Circuit's 'close nexus' requirement to be a logical corollary of 'related to' jurisdiction. Analytically, it insures that the proceeding serves a bankruptcy administration purpose on the date the bankruptcy court exercises that jurisdiction.").

> Pursuant to Section 14.1 of the Plan,
>
> The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, this Chapter 11 case and this Plan pursuant to, and for the purposes of §§ 105(a) and 1142 of the Bankruptcy Code and for, among other things the following purposes until such time as the Debtor's obligations under the Plan are fully discharged:
> …
> (b) To determine any and all adversary proceedings, applications and contested matters;
> …
> (j) To enforce and interpret the Plan and to hear and determine any dispute or any other matter arising out of or related to this Plan;
> (k) To recover all assets of the Debtor and property of the estate, wherever located;
> …
> (p) To hear and determine such other issues as the Bankruptcy Court deems necessary and reasonable to carry out the intent and purposes of this Plan.

ECF 124, at 32–34.

---

[4] This matter is "core" under 28 U.S.C. § 157(b)(2) and arises under or in the Debtor's bankruptcy case.

The Debtor's right to request a refund of the Adequate Protection Payments arises under sections 361, 363, 1123, and 1129 of the Code, the Cash Collateral Orders, the Plan, and the Confirmation Order. The Court authorized the Debtor to use the reserve funds as cash collateral to make the Adequate Protection Payments in accordance with sections 361 and 363. In so doing, the Court reserved certain of the parties' respective rights, including the Debtor's right to request a "potential reallocation, ***refund***, or replenishment" of those funds "depending on the outcome of the Final Hearing [on the Debtor's request to use cash collateral]." ECF 57, at 6–7 (emphasis added). Those payments allowed the case to proceed and, according to the Debtor, those funds are now needed to facilitate the Debtor's reorganization under the Plan. Moreover, the terms of the Plan reference the Debtor's ability to seek a refund.

The relief requested by the Motion thus is grounded in the Debtor's chapter 11 case and turns on the Court's interpretation of not only applicable law, but also its Cash Collateral Orders and the Confirmation Order. The Motion is within this Court's postconfirmation jurisdiction.

### III.    Analysis and Conclusions of Law

A chapter 11 debtor has many tools at its disposal to effectuate its reorganization. The Code provides the debtor with an ability, for example, to obtain postpetition financing and to use cash collateral on terms and under circumstances that would not be possible outside of the bankruptcy case. The Debtor used both of these tools in this case. The Court granted the Debtor authority to: (i) enter into a postpetition financing agreement with Casa Laxmi SA ("Casa Laxmi"), an entity organized pursuant to the laws of the Commonwealth of the Bahamas; and (ii) use certain cash collateral, which included funds in a reserve account with FNB. ECF 30, 31.

The Debtor's prepetition obligations to FNB consist of a promissory note in the original principal amount of $5,000,000 (the "Term Loan") and a line of credit in the original principal amount of $1,000,000 (the "Line of Credit"). The Term Loan appears to be secured by a first-

priority Deed of Trust, Assignment and Security Agreement dated January 4, 2011, and recorded among the land records of Cecil County, Maryland, at Liber 2960, Folio 119 (the "Real Property"). The Line of Credit appears to be secured by a second priority lien on the Real Property. On or about January 23, 2022, FNB also filed a UCC-1 Financing Statement with the Maryland State Department of Assessments and Taxation, asserting a first-priority lien on and against, substantially all personal property of the Debtor (collectively with the Real Property, the "Property").[5]

In addition, FNB's prepetition collateral included a deposit account that was funded by the Debtor and that held approximately $162,000.00 as of the petition date (the "Reserve Account"). The funds distributed from the Reserve Account under the Cash Collateral Orders are the focus of the Motion.

Both the Debtor and FNB agree that the Adequate Protection Payments were made from the Reserve Account and in accordance with the Cash Collateral Orders. They also agree that approximately $14,000.00 remains in the Reserve Account. They do not agree, however, on the treatment of the Adequate Protection Payments given the confirmation of the Plan and the related valuation of FNB's collateral.

    A.    *Debtor's General Rights to Use Reserve Funds and Seek Refund*

The Cash Collateral Orders and the Plan clearly reserved the parties' respective rights concerning valuation and the Adequate Protection Payments; this reservation of rights specifically included the Debtor's ability to request a refund of the Adequate Protection Payments. Most notably, the language of the Plan states: "Based upon the subsequent valuation of the Debtor's Property, the Debtor reserves the right to seek a refund of the amounts paid from the Escrow

---

[5] The parties all agree that the only Property of any value in this case is the Real Property. Accordingly, all remaining references to "Property" in this Opinion refer to the Real Property and the valuation of the Real Property in the subchapter V case.

Account to FNB following the entry of the Order and to be able to use those amounts to pay the obligations set out in this Plan."[6] ECF 124. All parties, including FNB, had notice of this provision of the Plan; no party objected and FNB, in fact, voted in favor of the Plan.[7]

The facts before the Court show that the Debtor had authority to use the funds in the Reserve Account to satisfy contingent adequate protection obligations to FNB. The Debtor's use of those funds under the Cash Collateral Orders was governed by sections 361 and 363 of the Code and subject to the Court's valuation determination. After the Court's July 7, 2023, ruling on adequate protection, no party objected or requested relief.[8]

FNB argues that, despite the parties' consent to the use of the reserve funds outside the terms of the prepetition loan documents,[9] the funds remain subject to the restrictions set forth in

---

[6] The Cash Collateral Orders generally stated that "the Debtor shall continue to use the cash collateral in the Escrow Account to make monthly payments to FNB in the amount of $23,657.81 on account of the Term Loan and $7,096.52 on account of the Line of Credit, provided, however, that any and all payments made by the Debtor under this Fifth Interim Order and under the prior Interim Orders are subject to further Order of the Court and potential reallocation, refund, or replenishment depending on the outcome of the Final Hearing." ECF 105; *see also* ECF 57 at 6–7 (Court's interim order (after further hearing) imposing this obligation). The Court notes that the Cash Collateral Orders referenced both "refund, or replenishment," and the Plan indicates the Debtor's intent to seek only a refund. In addition, although the Court used the term "Escrow Account" in the Cash Collateral Orders and the Confirmation Order, as explained below, that label does not determine the substance of the provision or the provision's legal effect, if any.

[7] "A bankruptcy court's order of confirmation is treated as a final judgment with res judicata effect," binding the parties by its terms and precluding them "from raising claims or issues that they could have or should have raised before confirmation." *In re Varat Enters., Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996). The facts before the Court show that the Debtor's ability to use the reserve funds and to seek a refund of the Adequate Protection Payments were issues raised and litigated under the Court's Cash Collateral Orders and the Confirmation Order. As discussed in the applicable case law, the doctrines of claims and issue preclusion preclude relitigation of those precise matters. *In re Dynamic Int'l Airways, LLC*, No. 17-10814, 2018 WL 7017736, at *6 (Bankr. M.D.N.C. Aug. 6, 2018) ("'The binding effect of a chapter 11 plan is in fact premised on statutory and common law ... preclusion,' … 'the provisions of a confirmed plan bind the debtor ... and any creditor, ... whether or not the claim or interest of such creditor ... is impaired under the plan and whether or not such creditor ... has accepted the plan.' Thus, 'federal courts have consistently applied *res judicata* principles to bar a party from asserting a legal position after failing, without reason, to object to the relevant proposed plan of reorganization or to appeal the confirmation order.'"). The Court's prior orders did not, however, address the merits of any refund request, as the parties' reserved that issue for postconfirmation resolution. *See, e.g.*, *In re DeCoro USA, Ltd.*, No. 09-10846C-11G, 2012 WL 1237558, at *2 (Bankr. M.D.N.C. Apr. 12, 2012) (discussing distinction between matters subject to claims and issue preclusion doctrines in the plan confirmation context and those not).

[8] *See* ECF 57; *see also infra* note 9 (discussing Court's July 2023 Order). Indeed, no such grant was likely necessary given the nature of the collateral and the valuation contingency—if the valuation came in low, the use of the Reserve Account to make payments to FNB may have been a warranted and proper use of the cash collateral; if the valuation came in high, FNB may not have been entitled to any adequate protection.

[9] The language of the January 2011 loan document suggests that monies in the Reserve Account, with the consent of FNB and the USDA, could be used to pay loan obligations, which is a reference to the Term Loan. ECF 43, Ex. A.

those documents. ECF 173. FNB thus asserts that the reserve funds may be used only to pay the loans and only with the concurrence of FNB and USDA. FNB's position treats the Reserve Account like an escrow agreement, which may in certain circumstances remove the escrowed funds from the estate.[10]

Despite the Court's and the parties' labeling the disputed funds as being in an "Escrow Account," that label belies the language of the parties' agreement.[11] The relevant section of the prepetition loan documents states,

> Borrower shall establish a deposit reserve account with Lender with an initial deposit of $75,000 by June 30, 2011. Borrower shall deposit $75,000 again by June 30 at each of the next four years thereafter, creating a reserve account of $375,000. This account will only be used for the loan payments and requires the concurrence of both Lender and the USDA.

ECF 43, Ex. A, § 5(j). According to this section, the Reserve Account is merely a deposit account that is subject to a contractual obligation for the Debtor to use that account as collateral to support the Debtor's obligations to FNB. This language does not divest the Debtor of its legal or equitable interests in the funds,[12] authorize FNB to directly use the funds, or establish a formal escrow

---

By an agreement dated October 19, 2022, FNB and the USDA agreed that the Debtor could use the funds to make certain payments on the Term Loan. ECF 172, Ex. 1. The Debtor filed this case before the expiration of that agreement. Although FNB proposed a limited use of the reserve funds in the parties' initial cash collateral stipulation, the Court granted the Debtor broader authority to use the reserve funds for purposes of adequate protection payments on both the Term Loan *and* the Line of Credit (subject to the Debtor's rights to challenge such payments) after an evidentiary hearing and by an order dated July 7, 2023 (the "July 2023 Order"). ECF 57. No objections were raised to the expanded use of the funds under the July 2023 Order. The terms of the July 2023 Order were continued by consent of the parties in the subsequent Cash Collateral Orders.

[10] *See, e.g.*, *In re Expert S. Tulsa, LLC*, 619 F. App'x 779, 782 (10th Cir. 2015) (finding that, under Oklahoma law, escrow funds were not property of the estate but noting that the court "did not mean to suggest that some uniform federal rule precludes the possibility that escrow funds can ever convey to a bankruptcy estate at its inception"); *In re Atlantic Gulf Cmtys. Corp.*, 369 B.R. 156, 164–65 (Bankr. D. Del. 2007) (escrow funds were not property of estate). *But see In re Cypress Health Sys. Fla., Inc.*, 536 B.R. 334, 338 (Bankr. N.D. Fla. 2015) (holding that escrow account was property of the estate where, under applicable state law, "[f]unds in escrow do not become property of a grantee until they are irretrievably placed beyond the grantor's reach"); *In re RISCmanagement, Inc.*, 304 B.R. 566, 580–81 (Bankr. D. Mass. 2004) (explaining split in case law on whether escrow accounts are property of the estate).

[11] *In re Johnson*, 355 B.R. 103, 110 (Bankr. C.D. Ill. 2006), *aff'd*, 371 B.R. 336 (C.D. Ill. 2007) ("The records of the BANK characterize the account as an 'escrow' account. Merely attaching the label 'escrow' to property or to a document does not make it such, however.") (footnote omitted).

[12] *See, e.g.*, *In re Star Development Group, LLC*, --- B.R. ----, 2023 WL 11834603 (Bankr. D. Md. Sept. 29, 2023) ("'In line with the broad definition of "property of the estate," money held in a bank account in the name of a debtor is presumed to be property of the bankruptcy estate.' *In re LandAmerica Fin. Grp., Inc.*, 412 B.R. 800, 809 (Bankr. E.D. Va. 2009); *see also Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 726 (D. Md. 1989), *aff'd*, 912 F.2d 464 (4th

arrangement.[13] It further does not require the Debtor to make any payments from the deposit account and does not assign any rights therein to any third party. Indeed, the language does nothing more than grant FNB sufficient rights in the Debtor's deposit account to perfect FNB's security interest therein under applicable state law.[14]

Based on the record created by the parties, the Court finds that the loan agreement at most required the Debtor to establish a deposit account for purposes of granting a security interest therein to FNB, which in turn provided further collateral for the Debtor's obligations to FNB. On the petition date, the funds in the Reserve Account became property of the Debtor's bankruptcy estate and cash collateral under sections 541 and 363 of the Code, respectively.[15]

---

Cir. 1990) (funds 'deposited in accounts owned and controlled by [the debtor] ... constitute property of the debtor's estate')."); 3 Collier on Bankruptcy ¶ 363.03[3] (2024) ("Under [section 363], cash and cash equivalents subject to a security interest or to other interests are cash collateral. … *In re Biedermann Mfg. Indus.*, 453 B.R. 802 (Bankr. E.D.N.C. 2011) (though bank with security interest in receivables had sent notice to account debtors to pay bank, receivables remained debtor's property).").

[13] An escrow agreement typically is a written agreement whereby the grantor transfers property to the escrow agent to be administered for the benefit of a third party. As one court has explained,

> Some courts have found that, in determining whether an escrow account is part of the debtor's estate, the nature and circumstances of the escrow agreement control. ... Factors that courts have found relevant "in this determination include, but are not limited to whether the debtor initiated and/or agreed to the creation of the escrow, what if any control the debtor exercises over it, the incipient source of it, the nature of the funs [sic] put into it, the recipient of its remainder (if any), the target of all its benefit, and the purpose of its creation." … In analyzing escrow arrangements, courts have recognized that escrow agreements are distinguished from mere contracts:
>
> > [A]n escrow is something more than a contract-it is a method of conveying property. When property is delivered in escrow the depositor loses control over it and an interest in the property passes to the ultimate grantee under the escrow agreement.

*In re RISCmanagement, Inc.*, 304 B.R. 566, 580–81 (Bankr. D. Mass. 2004).

> The language at issue in this case resembles that of a simple contract; it is a contractual provision that conveys a security interest to FNB under Maryland law. *See infra* note 14. Notably, the parties did not execute an escrow agreement, and the language in the loan documents speaks only to the establishment of a deposit "reserve" account. No rights are transferred to FNB and, indeed, it appears that the Debtor could use the proceeds of the deposit account for other purposes, though such use would result in a breach of the parties' contract.

[14] *See, e.g.*, Md. Code Ann., Com. Law §§ 9-104, 9-312(b), 9-314 (discussing steps for perfecting interest in deposit accounts under Maryland law). The finding that the Reserve Account was a grant of additional collateral is supported by the original statement of this condition, which is set forth in paragraph 9(h) of the "Attachment to RD Form 4279-3, 'Conditional Commitment (Business & Industry)[.]'" ECF 172, Ex. 2. The description of the Reserve Account is included in a list of negative covenants, which also included restrictions on the Debtor's ability to co-sign for third-party obligations, enter into any merger, or make outside investments without the prior written consent of the lender.

[15] Section 541 of the Code provides, in relevant part, that the estate includes "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. Although bankruptcy does not enlarge a debtor's or the estate's interests in property, the Code does, in certain instances, allow the Debtor to seek modifications to the parties' rights in the property. The debtor frequently seeks to value creditors' collateral and to adjust creditors' collateral packages under sections 506, 361, 363, and 364 of the Code. Moreover, section 363 of the Code defines cash collateral to include "cash, … deposit accounts, … or other cash equivalents whenever acquired in which the

The Debtor was entitled under the Code to use the Reserve Account during its bankruptcy case, subject to the provision of adequate protection to the creditors asserting an interest in those funds. As an initial matter, the Court directed those funds to be used solely to pay the senior lien holder, FNB.[16] That directed use was warranted under the circumstances, pending the valuation of the Property. With the valuation of the Property now complete, the Debtor is asking for a refund of that cash collateral.

The Court finds merit to the Debtor's position for at least two reasons. First, as noted below, FNB is significantly oversecured, and the amounts withdrawn from the Reserve Account were protected by a large equity cushion in the Property. Second, as the Debtor argues, the parties had ample opportunity to contest the use of the Reserve Account both in the context of the Cash Collateral Orders and the Confirmation Order, and did not. The Debtor's use of the Reserve Account to make the Adequate Protection Payments is akin to a debtor using a creditor's cash collateral for operational purposes during the pendency of the case[17] and is permitted by both the Code and the Court's prior orders.

---

[16] estate and an entity other than the estate have an interest," and allows a debtor to use cash collateral with the creditor's consent or, after notice and a hearing, upon court order that provides the creditor with adequate protection. 11 U.S.C. § 363(a), (c), (e).

[16] The Debtor's original motion to use cash collateral suggested using the reserve funds as cash collateral to make payments to FNB, but also sought more general relief to use that cash collateral. *See* ECF 4. For example, the motion stated, among other things, that "[i]n order for the Debtor to operate its business, meet its obligations and preserve its property and in order to avoid irreparable harm to the bankruptcy estate, it is necessary for the Debtor to use proceeds of the Pre-Petition Collateral, including the Funds held in the Escrow Account in which FNB asserts a security interest to pay its ordinary and necessary expenses, as set forth in the proposed budget." *Id.* at ¶ 20. The Debtor also specifically requested an order "[a]uthorizing the Debtor to use its accounts and right to payment in which FNB asserts a security interest to pay those obligations as set forth in the budget for a period of approximately fourteen (14) days from the Petition Date, through and including June 14, 2023, or such later time acceptable to the Court." *Id.* at 6.

[17] The Code contemplates that a debtor will use cash collateral for operational and other purposes during the case, which might consume or dissipate the collateral. *See* 3 Collier on Bankruptcy ¶ 363.03[4][c] (2024) ("The protection to the creditor offered by the cash collateral provisions does not implement any nonbankruptcy law limitations inherent to cash collateral, but rather is intended to recognize the unique nature of cash collateral, and the risk to the entity with an interest in such collateral, arising from the dissipation or consumption of the collateral in a rehabilitative effort in bankruptcy.") (footnotes omitted).

B.    *Parties' Rights Under the Plan and the Confirmation Order*

In addition to the parties' rights under the Code and the Cash Collateral Orders concerning the Reserve Account, the Court also must consider the impact, if any, of confirmation of the Plan on those rights and the parties' prepetition agreements.

A subchapter V or chapter 11 plan may, as here, alter the terms of creditors' prepetition agreements with the debtor. 11 U.S.C. § 1123(b)(5). To the extent the Debtor's authorized postpetition use of the reserve funds conflicts with any terms of the parties' prepetition agreements, those terms were modified by the Cash Collateral Orders and the Confirmation Order. Indeed, once a plan of reorganization is confirmed, "all obligations and rights of the parties are extinguished and replaced by the plan." *In re 785 Partners, LLC*, 470 B.R. 126, 137 (Bankr. S.D.N.Y. 2012) (collecting cases).[18] The confirmed plan, therefore, terminates the prior obligations and enforces the rights and obligations that are provided for in the plan.

As noted above, under the Plan, the Debtor reserved the right to seek a refund of monies paid to FNB as adequate protection under the Code[19] and then to use those funds to satisfy the

---

[18] Notably, terms of a prepetition contract that are not addressed in the confirmed plan may remain enforceable and valid as long as the terms are not mentioned in the plan and do not conflict with the plan. *See In re Ferry*, No. 8:11-BK-01854-RCT, 2021 WL 1783348, at *6 (Bankr. M.D. Fla. Mar. 6, 2021) ("Bayview's mortgage—with all its terms—was incorporated into the confirmed plan. And, to the extent that the mortgage included default provisions, those provisions were not contradicted by any term in the Plan or Confirmation Order. The default provisions thus remained enforceable.") (footnote omitted). The provisions of the confirmed plan are binding on the creditors and debtors regardless of whether the creditor is impaired by the plan or whether the creditor has accepted the plan. 11 U.S.C. § 1141(a); *Sirius Computer Sols., Inc.*, No. 10-23406-CIV, 2011 WL 3843943 at *3 (S.D. Fla. Aug. 29, 2011).

[19] The Plan provides:

    In its Second Interim Order Authorizing Debtor in Possession Financing And Use of Cash Collateral and Setting Final Hearing [Dkt. 57] entered July 7, 2023 (the "Order"), the Court held as follows:

        ORDERED, that the Debtor shall use the cash collateral in the Escrow Account to make monthly payments to FNB in the amount of $23,657.81 on account of the Term Loan and $7,096.52 on account of the Line of Credit, provided, however, that any and all payments made by the Debtor under this Order and the First Interim Orders are subject to further Order of the Court and potential reallocation, refund, or replenishment depending on the outcome of the Final Hearing . . . .

    Based upon the subsequent valuation of the Debtor's Property, the Debtor reserves the right to seek a refund of the amounts paid from the Escrow Account to FNB following the entry of the Order and to be able to use those amounts to pay the obligations set out in this Plan.

ECF 124, at p. 18, n. 3.

Debtor's obligations under the Plan.[20] The Debtor has now exercised that right and, as explained below, has provided sufficient evidence to support the requested refund. ECF 154, 172.

C.    *Value of the Property and Adequate Protection*

Having determined that the funds distributed from the Reserve Account were property of the estate and subject to a postconfirmation refund request under the Plan, the Court must evaluate whether and to what extent FNB's interest in the Reserve Account required additional adequate protection.

A secured creditor such as FNB is entitled to adequate protection of its interest in estate property during the pendency of the case.[21] The concept of adequate protection seeks to maintain the status quo between the secured creditor and the debtor while the debtor attempts to reorganize.[22] The Code thus often requires a debtor to provide a creditor with adequate protection when, among other things, the debtor is using the creditor's collateral or seeking to further encumber the creditor's collateral and such action could cause the value of the creditor's interest in the collateral to decline. 11 U.S.C. §§ 361, 363, 364.[23] In general, the nature and extent of any

---

[20] Property of the estate revested in the Debtor upon confirmation. 11 U.S.C. § 1141(b); ECF 124, § 4.1. As property of the estate, the Adequate Protection Payments revert to the Debtor and may be used to pay obligations set forth in the Plan. That intended use was specifically included in the Plan, and all parties had notice of it. FNB is bound by the terms of the confirmed Plan. 11 U.S.C. § 1141(a).

[21] *See, e.g.*, *In re GVM, Inc.*, 605 B.R. 315, 325 (Bankr. M.D. Pa. 2019) ("The first step of the adequate protection standard requires the court to determine the 'value of the secured creditor's interest.' … That value is nothing more than the 'interest of an entity in property.' … These well-established principles make it clear that the right to adequate protection is limited to the lesser of the value of an entity's interest in collateral or the amount of the entity's claim.").

[22] "Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for." H.R. Rep. No. 595 at 339.

[23] The Code provides guidance on what might constitute adequate protection. Specifically, section 361 provides that adequate protection may be provided by

   (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

   (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

   (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

adequate protection depends on the value of the collateral.[24] Moreover, adequate protection is not intended to increase the creditor's rights or provide the creditor with more value than supported by the collateral.[25]

Here, the Court determined the value of the Debtor's Property to be $10,300,000.00. ECF 112, 113. The Property serves as FNB's collateral. The value of FNB's interest in that Property is, in this case, the value of its claims against the Debtor, namely $4,847,700.00. ECF 57, 97, 154, 160. By any analysis, FNB's position is oversecured.

FNB does not necessarily contest its oversecured status, but rather challenges the extent of its equity cushion in the Property. ECF 160. At first glance, FNB appears to be protected by an equity cushion in excess of 100% of its claims' value. A closer review, however, reveals that Casa Laxmi is also granted a first priority lien in the Property under the Plan for the amount of any postconfirmation financing, up to $2,000,000.00.[26] ECF 124, 160.

A creditor's right to adequate protection is generally determined as of the petition date.[27] Casa Laxmi did not have a pari passu lien with FNB on the petition date or during the case; that

---

[24] Courts must carefully analyze any request for, or proposal regarding, adequate protection to strike an appropriate balance between the debtor's efforts to reorganize and a creditor's rights in the debtor's assets.

 Adequate protection under Section 361 is determined by consideration of: "(1) the value of the interest; (2) the risk that the value of the encumbrance will decline; and (3) whether the debtor's adequate protection proposal protects value against such risks." *In re Cambridge Woodbridge Apartments, L.L.C.*, 292 B.R. 832, 841 (Bankr. N.D. Ohio 2003) (citing *Martin v. U.S. Commodity Credit Corp. (In re Martin)*, 761 F.2d 472, 477 (8th Cir. 1985)). In order to encourage reorganization, "courts must be flexible in applying the adequate protection standard," which "flexibility, however, must not operate to the detriment of the secured creditor's interest," and "depends on the nature of the collateral and the nature of the debtor's proposed use of that collateral." *Martin*, 761 F.2d at 476.

*In re TeVoortwis Dairy, LLC*, 605 B.R. 833, 839 (Bankr. E.D. Mich. 2019).

[25] "The Supreme Court in *Timbers of Inwood Forest* held that the creditor was entitled to protection of the value of the collateral, not of other rights that the creditor might have." 3 Collier on Bankruptcy ¶ 362.07[3][d][ii] (2024) (discussing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Ass'n*, 484 U.S. 365 (1988)).

[26] Although FNB includes the USDA's lien in its analysis, that lien is junior to FNB's priority positions. ECF 124, §§ 3.5, 3.6 (classifying USDA has holding a third priority lien position). *See, e.g.*, 3 Collier on Bankruptcy ¶ 362.07[3][d][i] (2024) (noting that "[e]quity cushion in [the adequate protection] context does not necessarily require that the debtor have equity in the collateral" and providing example of a property that only provided sufficient equity cushion to the senior creditor but not the junior).

[27] Courts disagree concerning the best date to value collateral for purposes of adequate protection. As with determining how to value the collateral, the "purpose of the valuation" and the "proposed disposition or use" of the collateral—as directed by section 506 of the Code—should also guide the timing of the valuation. *See* 3 Collier on Bankruptcy ¶ 362.07[3][b][vi] (2024) ("Nevertheless, the court should adopt a valuation method consistent with section 506(a),

priority status was granted by the Plan.[28] Nevertheless, for completeness, the Court also considers Casa Laxmi's claim in the context of the requested refund. Although the Court is not aware of the exact amount of postpetition financing that will be needed by the Debtor, the maximum value of Casa Laxmi's first priority lien will be $2,000,000.00. That amount combined with the value of FNB's first and second priority liens totals $6,847,700.00.[29] Assuming a worst case scenario in which the Debtor draws the entire amount of the postconfirmation financing facility, FNB will have between an approximately 71% and 50% equity cushion in the Property.[30] Again, focusing on the value of the Property on the petition date and during the case, FNB's equity cushion was in excess of 100%.

The Court is mindful that an equity cushion is not appropriate adequate protection in every instance. Courts carefully scrutinize requests to use an equity cushion as adequate protection, and under certain circumstances, will authorize such use.[31] The Court agrees with that cautious but

---

looking to the purpose for which the valuation is made."); *see also infra* note 34. The Court need not resolve the timing issue here, however, because the parties did not raise it and timing is not determinative to the Court's resolution of the valuation issue. The Court focuses on the substance of the valuation itself.

[28] Casa Laxmi's lien under the DIP Financing Facility was subordinate to that of FNB. *See* ECF 57 (explaining that "the lien granted to Casa Laxmi under the DIP Financing documents maintains FNB's first priority lien in the Real Property to the extent of the value of that collateral as of the petition date. Joint Ex. 3, § 3.2").

[29] For purposes of adequate protection, the Court focuses on the value of the parties' claims and the potential for decline in the value of the collateral. *See generally* 3 Collier on Bankruptcy ¶ 362.07[3][d][iii] (2024) ("Consequently, in general a creditor's equity cushion is not intended to protect the creditor's right to accrue interest, but rather to assure the creditor that the amount of collateral available at the outset does not decrease as the case progresses. In other words, an oversecured creditor's interest in property which must be protected 'encompasses the decline in the value of the collateral only, rather than perpetuating the ratio of collateral to debt.'") (citations omitted).

[30] As the Debtor explained, "In that event, with the value of the collateral having been determined to be $10,300,000.00, FNB would still have an equity cushion of $3,452,300.00 [$10,300,000.00 - $2,000,000.00 - $4,847,700.00] representing a cushion of more than 71% over the amount of the Pre-Petition Indebtedness." ECF 154, at 12, n. 1. The 71% estimation is based on the value of the equity cushion as compared to FNB's claim; the 50% valuation is based on the value of the equity cushion as compared to the total amount of FNB's claim and Casa Laxmi's maximum claim.

[31] As one court has explained,

> Courts may find that there is adequate protection for a secured creditor where there is equity in the property, but the equity cushion must be significant. *See In re Rorie*, 98 B.R. 215, 221 (Bankr. E.D. Pa. 1989) (stating that in determining whether the equity cushion provides adequate protection, the court considers factors such as "the size of the cushion; the rate at which the cushion will be eroded; and whether periodic payments are to be made to prevent or mitigate the erosion of the cushion," and holding that an equity cushion valued at almost 42% of the claim is sufficient to provide adequate protection); *In re McKillips,* 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) (stating that "an equity cushion of 20% or more constitutes adequate protection," while "an equity cushion under 11% is insufficient to provide adequate protection"); *In re James River*

balanced approach, as it serves the primary goals of any chapter 11 case, namely providing a debtor with an opportunity to reorganize and protecting creditors' interest during that process.

Here, the Property was valued by FNB's appraiser as a going concern under two different methodologies: a cost approach and a comparable transactions approach.[32] The appraiser's evaluation is thorough and detailed in its explanation of, among other things, the assumptions underlying the valuation and the basis for any adjustments. The two valuation approaches yielded similar results: $10,000,000.00 under the cost approach and $10,300,000.00 under the comparable transaction approach. The appraiser then concluded that the "as is" market value of the Property is $10,300,000.00.[33]

The Court was satisfied with the appraisal at the time it approved the valuation and finds the appraisal to be an appropriate and reliable valuation of the Property for purposes of adequate protection in the context of the Motion. The amount of a creditor's secured claim against the estate is determined under section 506 of the Code. 11 U.S.C. § 506. In *Associates Commercial Corp. v. Rash*, the Supreme Court held that "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question." *Id.* at 520 U.S. 953, 962. Although a chapter 13 case, several courts have applied the reasoning of *Rash* to adequate protection determinations in

<hr>

*Assocs.*, 148 B.R. 790, 796 (E.D. Va. 1992) (holding that a 2% equity cushion is insufficient to provide adequate protection because of the deterioration of the equity cushion from accumulating interest).

*In re O'Farrill*, 569 B.R. 586, 591 (Bankr. S.D.N.Y. 2017); *see also In re Health Diagnostic Lab'y, Inc.*, No. 15–32919–KRH, 2015 WL 4915621, at *3 (Bankr. E.D. Va. Aug. 17, 2015) ("Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection.[] *Franklin*, 416 B.R. at 528 (citing *Kost*, 102 B.R. at 831–32). Additionally, in *In re Rogers Development Corp.*, this Court found that an equity cushion of 15% to 20% constituted adequate protection for a creditor. 2 B.R. 679 (Bankr.E.D.Va.1980).").

[32] The parties agreed to the valuation of the Property offered by FNB and its appraiser, Newmark Valuation & Advisory. ECF 160, ¶ 13; *see also* ECF 110, Ex. 3.

[33] In reaching this conclusion, the appraiser notes, "The cost approach is given appropriate weight because it is a reliable valuation method for the subject as the subject is a specialty institutional use. However, the age of the improvements results in subjective depreciation. The sales comparison approach is given appropriate weight, as it is a relevant method for owner-user properties because it directly considers the prices of alternative properties with similar utility for which potential buyers would be competing. The income capitalization approach is not applicable to the subject and is not used." ECF 110, Ex. 3.

chapter 11 cases.[34] The Court finds the analysis of those courts persuasive under the facts of this particular matter, where the Debtor not only intended to continue to operate as a going concern but confirmed a plan of reorganization implementing that intent.

The Court acknowledges FNB's concerns regarding potential fluctuation in the value of the Property if the Debtor's postconfirmation operations fail. The Court does not, however, have any evidence before it concerning those risks; it also finds the "proposed disposition or use" of the Property on the petition date and during the case the more appropriate valuation point in this matter.[35] The kind of postconfirmation risk identified by FNB is not an adequate protection issue, but rather a confirmation issue ultimately governed by the Plan and the Confirmation Order.

Considering all the relevant facts, the Courts finds that the amount of FNB's equity cushion in the Property is sufficient adequate protection under sections 361 and 363 of the Code.[36] As such, no Adequate Protection Payments were required by the Code during the preconfirmation period in this case. In addition, the Court notes that FNB is now further protected by the Confirmation Order and the terms of the Plan, which it negotiated and supported.

---

[34] *See, e.g.*, *In re Residential Cap., LLC*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013) (stating that "[a]lthough this case involves the consensual use of collateral in the context of a sale under chapter 11, the reasoning of *Rash* is equally applicable here" and using going-concern value) (collecting relevant case law); *see also In re Riverstreet Ventures, LLC*, No. 21-10818, 2021 WL 4296167, at *3 (Bankr. E.D. La. Sept. 20, 2021) (same); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 577 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) (same); *In re Health Diagnostic Lab'y, Inc.*, No. 15–32919–KRH, 2015 WL 4915621, at *4 (Bankr. E.D. Va. Aug. 17, 2015) (using going concern value in adequate protection determination).

[35] Whether the Court looks to the petition date, the date of the adequate protection request, or the date of the valuation, the proposed use of the Property remains the same—operation as a going concern. The Court has no evidence or basis to find that another proposed use or disposition is more appropriate for the valuation of the Property in this case.

[36] Whether adequate protection is sufficient in any given case is left to the discretion of the Court, a decision typically made under a totality of the circumstances standard. *See, e.g.*, *In re Gregg*, No. 13-00665-dd, 2014 WL 5801672, at *2 (Bankr. D.S.C. Nov. 7, 2014) (citing *Robbins v. Robbins (In re Robbins)*, 964 F.2d 342 (4th Cir. 1992) and noting that a determination of cause "must be fact specific and look to the totality of the circumstances"); *see also In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); *Specialized Loan Servicing LLC v. Bird (In re Bird)*, No. 21-11271-TSC, 2022 WL 829105 (D. Md. Feb. 18, 2022); *In re Lister-Petter Americas, Inc.*, No. 15-10502, 2017 WL 1511888, at *7 (Bankr. D. Kan. Apr. 26, 2017) ("Adequate protection is a question of fact to be decided on a case-by-case basis under the totality of the circumstances.").

IV.    **Conclusion**

The Debtor was authorized to use cash collateral, subject to the requirements of the Code and the Court's orders. The Debtor did exactly that in this matter, and the parties' rights with respect to the Debtor's use of cash collateral are governed by prior orders in this case. All affected parties had notice and an opportunity to object to, or appeal, the Court's Cash Collateral Orders and the Confirmation Order. Those orders are now final and binding upon the parties. Under the terms of the Cash Collateral Orders, the Plan, and the Confirmation Order, the Debtor was entitled to seek a determination of the value of the Property and a refund of any excess Adequate Protection Payments. The Debtor has established its right to a refund of $146,585.17 from FNB, which funds must be used to pay the Debtor's obligations set out in the Plan. ECF 124, 142. The Court will enter a separate order consistent with this Memorandum Opinion.

cc:    Debtor
       Debtor's Counsel
       FNB's Counsel
       Subchapter V Trustee
       All Creditors


**END OF MEMORANDUM OPINION**